NOT FOR PUBLICATION WTHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4006-18

GANNETT SATELLITE
INFORMATION NETWORK,
LLC, d/b/a ASBURY PARK
PRESS,

      Plaintiff-Respondent/
Cross-Appellant,

v.

TOWNSHIP OF NEPTUNE,

      Defendant-Appellant/
Cross-Respondent.

_____

**APPROVED FOR PUBLICATION**

**April 8, 2021**

**APPELLATE DIVISION**

Argued February 23, 2021 – Decided April 8, 2021

Before Judges Yannotti, Mawla, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-2616-17.

Jonathan F. Cohen argued the cause for appellant/cross-respondent (Plosia Cohen, LLC, attorneys; Jonathan F. Cohen and James L. Plosia Jr., of counsel and on the briefs).

Thomas J. Cafferty argued the cause for respondent/cross-appellant (Gibbons, PC, attorneys; Thomas J. Cafferty, of counsel and on the briefs; Nomi I. Lowy, Lauren James-Weir, and Charlotte Howells, on the briefs).

Carl R. Woodward, III, argued the cause for amici curiae New Jersey State League of Municipalities, New Jersey Institute of Local Government Attorneys, and New Jersey School Boards Association (Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC, attorneys; Carl R. Woodward, III, on the brief).

Steven R. Cohen argued the cause for amicus curiae New Jersey State Policeman's Benevolent Association (Selikoff & Cohen, PA, attorneys; Steven R. Cohen, of counsel and on the brief).

Robert A. Honecker, Jr., argued the cause for amicus curiae Monmouth County Chiefs of Police Association (Ansell Grimm & Aaron, PC, attorneys; Robert A. Honecker, Jr., of counsel and on the brief).

David L. Disler argued the cause for amicus curiae New Jersey State Association of Chiefs of Police (Porzio, Bromberg & Newman, PC, attorneys; Vito A. Gagliardi, Jr., of counsel; David L. Disler, on the brief).

Raymond R. Chance, III, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Raymond R. Chance, III, of counsel; Suzanne Davies, Deputy Attorney General, on the brief).

CJ Griffin argued the cause for amici curiae American Civil Liberties Union of New Jersey, Association of Criminal Defense Lawyers of New Jersey, Libertarians for Transparent Government, Latino Leadership Alliance of New Jersey, and New Jersey Foundation for Open Government (Pashman Stein Walder Hayden, PC, and American Civil Liberties Union of New Jersey Foundation, attorneys; CJ Griffin, of counsel and on the brief).

2

The opinion of the court was delivered by

YANNOTTI, P.J.A.D.

In May 2017, Gannett Satellite Information Network, LLC (Gannett), an entity that publishes the Asbury Park Press, submitted a request to the Township of Neptune seeking copies of the Internal Affairs (IA) file of Philip Seidle, who had been a Sergeant in the Township's Police Department. Gannett sought access to the records pursuant to the common law and the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. The Township denied the request.

Gannett then commenced this action to compel the Township to disclose the records. The trial court determined that the records were exempt from disclosure under OPRA, but Gannett was entitled to the records under the common law. The court also awarded Gannett attorney's fees. The Township appeals and Gannett cross appeals from the trial court's judgment.

For the following reasons, we conclude the trial court correctly found that Gannett was not entitled to access to Seidle's IA file pursuant to OPRA, but disclosure was required under the common law right of access. We also conclude the trial court erred in awarding of attorney's fees to Gannett. Therefore, we affirm in part and reverse in part on the appeal, and affirm on the cross appeal.

I.

On June 16, 2015, Seidle shot and killed his ex-wife Tamara near a heavily populated area of Asbury Park, using his service revolver, in the presence of their seven-year-old daughter. On March 10, 2016, Seidle pled guilty to aggravated manslaughter. He was later sentenced to a thirty-year prison term.

The Monmouth County Prosecutor's Office (MCPO) investigated the response of law enforcement to Tamara's death and on June 30, 2016, issued a report, which detailed its findings. In the report, the MCPO recounted the Seidles' history of domestic violence.

The MCPO described in detail seven specific incidents of domestic violence reported to the Neptune Township Police Department (NTPD) involving Seidle and Tamara that occurred between 1994 and 2015. The MCPO also described an additional domestic violence incident was reported to the Tinton Falls Police Department in 2012.

The MCPO's report also noted that seven calls had been made to the NTPD concerning the Seidles' child custody issues. In addition, Seidle or Tamara made seven "traditional" calls to the NTPD but they "did not touch in any way on their relationship . . . ."

4

The MCPO stated that its investigation had "disclosed a critical flaw in the domestic violence policies and procedures that currently exist statewide." It found "domestic violence incidents" that do not result in the "filing of criminal charges or a temporary restraining order may still call into question the fitness-for-duty of a police officer."

The MCPO added that, "a police officer who has numerous [IA] complaints - either due to internal departmental policy violations or from complaints by citizens - raises a red flag which may warrant a fitness-for-duty evaluation by the agency." To address these concerns, the MCPO implemented an Early Warning System for all law enforcement agencies in Monmouth County.

By letter dated May 24, 2017, Gannett submitted a request to the Township for access to Seidle's IA file pursuant to OPRA and the common law. The Township denied the request. The Township provided Gannett a Vaughn[1] index describing the documents withheld, which related to twenty-eight separate incidents involving Seidle and his ex-wife.

---

[1] Vaughn v. Rosen, 484 F.2d 820, 826–28 (D.C. Cir. 1973).

A-4006-18

On July 19, 2017, Gannett filed a verified complaint claiming that the Township's failure to provide it with access to Seidle's IA file was a violation of OPRA and the common law. The trial court entered an order requiring the Township to show cause why the relief sought in the complaint should not be granted. Thereafter, the Township filed a motion to dismiss the complaint.

The judge heard oral argument on the motion and ordered the Township to submit the records to the court for an in-camera review. By letter dated December 8, 2017, the attorney for the Township informed the court that Seidle opposed public disclosure of his IA file. The attorney stated that Seidle believed disclosure of the file would be an invasion of his privacy and prejudice him in the wrongful death action his children and Tamara's estate had brought against him.

Gannett objected to the court's consideration of the December 8, 2017 letter, and the judge conducted a telephone conference, in which she referred to the MCPO's report and an article that appeared in the Asbury Park Press on January 22, 2018, titled "Philip Seidle, Killer Cop: Ex-Wife 'did not become a victim until I killed her.'" The author of the article obtained information from several sources, including police reports, the MCPO's report, public court documents, and letters and records provided by Seidle.

A-4006-18

On August 1, 2018, the judge filed a written opinion on Gannett's complaint. The judge noted that the file contained several types of documents, including IA investigative reports, citizen complaints, police and incident reports, fitness-for-duty evaluations, disciplinary notices and decisions, domestic violence records, and newspaper articles. The documents were dated from March 27, 1994, through May 10, 2016.

The judge stated that all but six of the twenty-eight incidents reflected in the Township's Vaughn index had been publicly disclosed, and facts related to the domestic violence incidents were disclosed in the MCPO's report. The judge noted, however, that the IA file "provides far more detail about the previously disclosed events" than the MCPO's report or the Asbury Park Press article.

The judge determined that the records were exempt from disclosure under OPRA. The judge noted that the Attorney General's Internal Affairs Policy and Procedures (IAPP) governed IA investigations by local law enforcement agencies. The IAPP, which was first issued in 1991 and thereafter amended, provides that records pertaining to such investigations are confidential.

The judge noted that N.J.S.A. 40A:14-181 required all law enforcement agencies to adopt and implement guidelines consistent with the IAPP, thereby bestowing "the imprimatur of statutory authority on the IAPP." The judge

7 A-4006-18

concluded that "because the confidentiality provisions of the IAPP had been codified by statute," the records are exempt from disclosure under OPRA pursuant to N.J.S.A. 47:1A-9, which provides that OPRA shall not abrogate any grant of confidentiality otherwise established by statute.

The judge then considered whether Gannett was entitled to access to the entire IA file under the common law right of access to public records and conducted the balancing required by Loigman v. Kimmelman, 102 N.J. 98, 113 (1986). The judge stated that facts concerning most of the incidents recorded in Seidle's IA file had already been disclosed by the MCPO's report or the Asbury Park Press article and that denying access "would be tantamount to closing the barn door after the horse has bolted."

The judge recognized that there were important public policy considerations favoring confidentiality of the records but found that the unique circumstances of the case weighed in favor of disclosure. Those facts included the "widespread media attention" received by the case and that "[r]umors regarding the Seidles' history of domestic violence resulted in a public outcry by citizens who questioned how such a tragedy could have occurred at the hands of a police officer."

A-4006-18

The judge noted that "Seidle voluntarily provided information from his [IA] file to the [Asbury Park Press] and waived any claim that the information is private." Furthermore, "[t]here [was] nothing about the nature of the [IA] incidents or the manner in which they were reported, that would lead [the] court to conclude that disclosure of part or all of the records would deter citizens or fellow officers from reporting police misconduct." The judge stated that the potential harm from disclosure was minimal because much of the information was already public and that any harm from disclosure could be mitigated by redactions that would protect the identity of other officers, complainants, or witnesses.

The judge further found that the public was "entitled to answers regarding how an officer with twenty-one . . . police involved reports of conflict with his wife, could remain on the police force, armed with a weapon that was used to murder his ex-wife." The judge stated that the public had "a right to inquire whether existing policies were in place to adequately address officers at risk or whether recent reforms or policies [had] gone far enough." The judge found that because Seidle had already pleaded guilty and would "remain in prison for decades, disclosure [would] not interfere with any investigative or disciplinary proceedings."

9

The judge also considered whether Gannett was entitled to the award of attorney's fees. The judge found that were it not for the court's decision, the records would not be disclosed. The judge decided, however, that because Gannett did not prevail on the OPRA claim, only a partial fee award was appropriate. The judge stated that the parties should confer and attempt to resolve the reasonable attorney's fees that should be awarded to Gannett.

The judge memorialized her decision in an order filed on August 1, 2018. Thereafter, the court granted motions by the Monmouth County Chiefs of Police Association (MCCPA) and the New Jersey State Association of Chiefs of Police (NJSACP) for leave to participate in the case as amici curiae.

On August 16, 2018, the Township filed a motion for reconsideration of the August 1, 2018 order. The judge heard oral argument and on May 13, 2019, filed an order and written opinion denying the Township's motion for reconsideration and awarding Gannett $85,665.13 in attorney's fees and $472.99 in costs. The judge stayed her orders pending appeal. The Township appeals and Gannett cross appeals from the court's August 1, 2018, and August 16, 2018, orders.

We granted motions for leave to appear as amici curiae by: New Jersey State League of Municipalities, New Jersey Institute of Local Government

10

Attorneys and New Jersey School Boards Association (collectively, the NJLM); the New Jersey State Policeman's Benevolent Association (NJSPBA); the Attorney General of New Jersey; and American Civil Liberties Union of New Jersey, Association of Criminal Defense Lawyers of New Jersey, Libertarians for Transparent Government, Latino Leadership Alliance of New Jersey and New Jersey Foundation for Open Government (collectively, the ACLU-NJ). The MCCPA and NJSACP also have participated in the appeal as amici curiae.

On November 13, 2019, the Attorney General informed the court that, pursuant to his authority under the IAPP, he intended to release Seidle's IA file, with certain redactions. On December 2, 2020, the Attorney General notified the court that he had provided the redacted IA file to all parties and amici curiae and that he would be making the records available to the public that same day.

## II.

On appeal, the Township argues: (1) the trial court misapplied the common law balancing test by ruling that the public was entitled to Seidle's IA file; (2) the court erred by awarding Gannett counsel fees under the common law; and (3) the hourly fees of Gannett's attorneys should be reduced since they are "out-of-step" with fees commonly awarded in matters involving requests for public records.

In responding to the Township's appeal and in support of its cross appeal, Gannett argues: (1) the trial court correctly ruled that it is entitled to the requested records under the common law; (2) it is entitled to an award of attorney's fees under the common law; (3) the court did not abuse its discretion in the amount of attorney's fees awarded; (4) the court did not err by denying the Township's motion for reconsideration; and (5) it was entitled to the records under OPRA.

The Attorney General argues: (1) law enforcement IA records are not accessible under OPRA and can only be disclosed, if at all, pursuant to court order; and (2) attorney's fees are not available in actions brought under the common law right of access. The Attorney General does not take a position on whether the trial court erred in ordering release of Seidle's IA file under the common law.

The MCCPA contends: (1) the trial court did not consider relevant factors in concluding that Gannett has a common law right of access to Seidle's IA records; and (2) the MCPO's internal review did not constitute a definitive executive act authorizing disclosure of all IA reports related to Seidle.

In addition, the NJLM argues: (1) there is no authority for the award of attorney's fees under the common law right of access to public records; (2) a

12

custodian of records cannot be expected to assume the function of weighing the factors relevant under the common law in determining whether to release an IA file especially where there is no right of access to these records under OPRA; (3) the court erred in balancing Gannett's interest in access against the Township's interest in confidentiality; and (4) the counsel fees awarded were neither reasonable nor appropriate.

The NJSACP contends: (1) the trial court failed to consider the State-wide ramifications of publicly releasing IA documents to a newspaper and the effect such disclosure will have on future IA investigations; and (2) the trial court failed to properly consider the Attorney General's IAPP as part of the balancing test for the common law right of access to public records.

Furthermore, the NJSPBA contends: (1) the trial court correctly denied Gannett access to the requested documents under OPRA; and (2) the court erred by granting Gannett access to the documents under the common law.

Finally, the ACLU-NJ argues: (1) public access to IA files greatly benefits the public and police officers; (2) the Attorney General's IAPP does not exempt documents from access under OPRA; (3) the trial court correctly concluded that access to Seidle's IA file should be granted under the common

A-4006-18

law; and (4) the trial court correctly determined that Gannett was entitled to attorney's fees under the common law.

III.

We first consider whether the issues raised on the appeal and cross appeal are moot in light of the Attorney General's release of Seidle's IA file. We conclude that the issues raised are not moot.

Mootness is a threshold "determination rooted in the notion that judicial power is to be exercised only when a party is immediately threatened with harm." Betancourt v. Trinitas Hosp., 415 N.J. Super. 301, 311 (App. Div. 2010) (citing Jackson v. Dep't of Corr., 335 N.J. Super. 227, 231 (App. Div. 2000)). "An issue is 'moot' when the decision sought in the matter, when rendered, can have no practical effect on the existing controversy." Greenfield v. N.J. Dep't of Corr., 382 N.J. Super. 254, 257-58 (App. Div. 2006) (quoting N.Y. Susquehanna & W. Ry. Corp. v. State Dep't of Treasury, Div. of Tax'n, 6 N.J. Tax 575, 582 (Tax Ct. 1984)).

In this case, the trial court awarded Gannett attorney's fees because it prevailed on its claim under the common law right of access. The Attorney General's release of Seidle's IA file does not affect the order awarding Gannett attorney's fees. Moreover, the issue of whether Gannett is entitled to access to

14

the records under the common law is not moot because that finding was the basis for the award of attorney's fees. In addition, the issue of whether Gannett is entitled to access to the records under OPRA is not moot because Gannett contends it is entitled to the award of counsel fees under either OPRA or the common law. Therefore, we will address the issues raised in the appeal and cross appeal.

## IV.

Gannett argues that the trial court erred by finding it was not entitled to access to the IA file under OPRA. "The trial court's determinations with respect to the applicability of OPRA are legal conclusions subject to de novo review." O'Shea v. Twp. of W. Milford, 410 N.J. Super. 371, 379 (App. Div. 2009).

OPRA generally provides that the public is entitled to access to certain government records. N.J.S.A. 47:1A-1. However, OPRA expressly provides that "personnel or pension records of any individual in the possession of a public agency, including but not limited to records relating to any grievance filed by or against an individual, shall not be considered a government record and shall not be made available for public access" except in certain limited circumstances. N.J.S.A. 47:1A-10. One of the limited exceptions is when such records are "required to be disclosed by another law." Ibid.

A-4006-18

OPRA also provides that the provisions of N.J.S.A. 47:1A-5, which governs access to government records, "shall not abrogate any exemption of a public record or government record from public access heretofore made pursuant to . . . any other statute." N.J.S.A. 47:1A-9(a). In addition, OPRA states that nothing in N.J.S.A. 47:1A-5 shall

> abrogate or erode any executive or legislative privilege or grant of confidentiality heretofore established or recognized by the Constitution of this State, statute, court rule or judicial case law, which privilege or grant of confidentiality may duly be claimed to restrict public access to a public record or government record.
>
> [N.J.S.A. 47:1A-9(b).]

In Fraternal Order of Police, Newark Lodge Number 12 v. City of Newark, the plaintiff challenged an ordinance that permitted the City of Newark to create a civilian oversight board that was intended "to provide a greater role for civilian participation in the review of police internal investigations and in the resolution of civilian complaints." 244 N.J. 75, 80 (2020). The Court held that the creation of the board was permitted by law and that the board could investigate citizen complaints of police misconduct. Id. at 80-81.

The Court held, however, that the board could not "exercise its investigatory powers when a concurrent investigation [was being] conducted by the Newark Police Department's [IA] unit." Id. at 81. The Court stated IA

16

investigations are "carefully regulated by law" and must be conducted under the supervision of the police chief and comply with procedures established by Newark's Public Safety Director and the IAPP. Ibid. The Court concluded that concurrent investigations would "conflict with specific requirements imposed on IA investigations and their results." Ibid.

In reaching that decision, the Court considered the IAPP. The Court noted that the Attorney General was authorized under N.J.S.A. 52:17B-4(d), "to adopt rules and regulations for the efficiency of the Department of Law and Public Safety's work and administration" and that he exercised that authority in 1991 when issuing the IAPP. Id. at 100. Among the mandatory provisions of the IAPP, is a requirement that "each agency establish and maintain a confidential process." Id. at 101. In 1996, the Legislature enacted N.J.S.A. 40A:14-181, which required all law enforcement agencies in the State to implement guidelines consistent with the IAPP. Ibid.

The Court found that "[s]ection 181 effectively made the . . . IAPP required policy for all municipal law enforcement agencies in New Jersey." Ibid. It concluded that "the Legislature plainly intended that the Attorney General's standards and protocols be followed uniformly by law enforcement agencies . . . ." Id. at 103.

17

The Court further found that N.J.S.A. 40A:14-181 and N.J.S.A. 40A:14-118, which governs the creation of a police force and the powers and duties of the police chief, "together, create an IA function that is, in the aspects discussed, rigidly regulated." Id. at 105. The Court explained that:

> The Legislature, when requiring all local law enforcement agencies to adopt the Attorney General's IAPP, had to have been cognizant of the IAPP's patent intent to . . . strictly preserve the confidentiality of the IA process for reasons that the Attorney General has explained. In argument to this Court, the Attorney General emphasizes the premium placed on confidentiality during the investigatory process, finding it necessary to encourage and protect those who come forward with complaints or evidence of police misconduct or problematic behavior . . . . Although that policy is not ours to determine, those guiding principles have been plain on the face of the IAPP since its first iteration.

> The Attorney General's protocols allow for careful factual development and protective procedures designed to ensure confidentiality of information collected and thus to encourage people to come forward and cooperate, sure of that confidentiality . . . . It is a key feature insisted upon in the [IAPP]. And the Legislature has required law enforcement agencies . . . to implement it as the Attorney General has directed. N.J.S.A. 40A:14-181. There is no flexibility on that point.

> Thus, under present law, the IA process must remain a self-contained, confidential process as designed with respect to the personnel selected and trained to perform such investigations, responsive to

the chief who has ultimate responsibility for the IA operation, and separated on a reporting basis from others on the force. . . . The process and the information gathered in such investigations is subject to strict confidentiality requirements, as currently mandated by the [IAPP], with which local law enforcement agencies are compelled by section 181 to comply.

[Id. at 105-07.]

The Court stated that an investigation by a municipal civilian review board during an ongoing IA investigation would "interfere[] with the intended purpose of section 181's and the IAPP's requirements." Id. at 107.

After Fraternal Order of Police was decided, a panel of this court issued its opinion in Libertarians for Transparent Government v. Cumberland County, 465 N.J. Super. 11 (App. Div. 2020), certif. granted, 245 N.J. 38 (2021). In that case, a corrections officer was charged in a Preliminary Notice of Disciplinary Action (PNDA) with misconduct related to improper fraternization with inmates. Id. at 13.

After the officer cooperated in an investigation that led to charges against four other officers, he was allowed to retire in good standing pursuant to a settlement agreement and the disciplinary charges against him were dismissed. Id. at 14. The plaintiff submitted a request to Cumberland County for a copy of the settlement agreement claiming it was a government record that was subject

to disclosure under OPRA. Ibid. The County denied access to the document and the plaintiff brought an OPRA action in the Superior Court seeking access to the document. Id. at 14-15. The trial court found that the plaintiff was entitled to access under OPRA and ordered the County to release the settlement agreement with redactions. Id. at 15. The appellate panel reversed. Id. at 13.

Relying on the language in N.J.S.A. 47:1A-10, the panel noted that "a public employee's disciplinary records are personnel records not subject to public access under [OPRA]." Id. at 20. The court held that "[s]ettlement agreements by public agencies to resolve internal disciplinary charges" also are exempt from disclosure under N.J.S.A. 47:1A-10. Id. at 23. The court remanded the matter to the trial court to determine whether the settlement agreement should be released under the common law right of access to public records. Id. at 30-31.

Thereafter, a panel of this court rendered its decision in In re Attorney General Law Enforcement Directive Numbers 2020-05 and 2020-6, 465 N.J. Super. 111 (App. Div.), certif. granted, 244 N.J. 447 (2020). In that case, several law enforcement agencies challenged the Attorney General's directives, which required, among other things, every law enforcement agency in the State to publish, each calendar year, "a synopsis of all complaints in which an officer

received final discipline of termination, demotion, or a suspension of more than five days, including the name of the officer, a summary of the misconduct, and the sanction imposed." Id. at 124.

Among other contentions, the appellant law enforcement agencies argued that the Attorney General did not have authority to issue the Directives because they were in conflict with N.J.S.A. 47:1A-10, the exemption under OPRA for personnel records. Id. at 125. The appellants contended that the Attorney General lacked the authority to amend the IAPP "so as to attach an officer's name to the summary descriptions of completed discipline that local law enforcement agencies were ordered to publish annually in the 2019 version of the IAPP." Id. at 139.

The court noted that "this [was] not an OPRA case." Ibid. The court commented, however, that "[w]ere this an OPRA case, with third parties seeking the information the Attorney General has determined to release in Directives 2020-5 and 2020-6, those third parties would not be entitled to the information under OPRA." Id. at 139-40. The court referenced its recent decision in Libertarians where it held that a public employee's internal disciplinary records were personnel records exempt from disclosure under N.J.S.A. 47:1A-10. Id. at 140.

The court also recognized that the IAPP provides that "[p]ersonnel records are separate and distinct from [IA] investigation records, and [IA] investigative reports shall never be placed in personnel records, nor shall personnel records be comingled with [IA] files." Id. at 143 n.3 (first alteration in original). The court stated that the Attorney General's "characterization of the records [in the IAPP was] not controlling for purposes of OPRA." Ibid. It concluded that "[t]he disciplinary information the Attorney General has ordered made public in the Directives clearly comes under the heading of personnel records for purposes of OPRA." Ibid.

In addition, the court considered whether the Attorney General had the authority to direct that the information in the IA files be made public. Id. at 140-48. The court stated that N.J.S.A. 47:1A-10 "represents the State's public policy to protect the personnel records of public employees from disclosure[,]" id. at 142, but recognized that the statute permits the release of such records "when required to be disclosed . . . by another law." Id. at 143 (quoting N.J.S.A. 47:1A-10).

The court explained that, pursuant to N.J.S.A. 52:17B-98, "[t]he Legislature ha[d] designated the Attorney General as New Jersey's 'chief law enforcement officer,' responsible 'for the general supervision of criminal justice'

A-4006-18

in the State." Id. at 143-44. Furthermore, under N.J.S.A. 52:17B-4(d), the Legislature "charged [the Attorney General] with 'formulat[ing] and adopt[ing] rules and regulations for the efficient conduct of the work and general administration of the [D]epartment." Id. at 144 (all but first alterations in original).

The court determined that the Attorney General had exercised that authority by issuing the IAPP and that N.J.S.A. 40A:14-181 "effectively made" the IAPP "required policy for all municipal law enforcement agencies in New Jersey." Ibid. (quoting Fraternal Order of Police, 244 N.J. at 101). The court found that the authority granted to the Attorney General by the Legislature "in those several statutes is 'another law' that permits the Attorney General to . . . order[] the publication of the names of New Jersey law enforcement officers sanctioned for serious disciplinary violations." Ibid. The court therefore held that the Directives did not violate N.J.S.A. 47:1A-10. Ibid.

The court also rejected the appellants' argument that the Attorney General could not abrogate N.J.S.A. 47:1A-10 by issuing the Directives. Id. at 144-45. It found the "Attorney General directives have the force of law for police entities in New Jersey because the Legislature has deemed it to be so." Id. at 145. The court stated that "[n]owhere is that clearer than in the case of the IAPP, which

23

the Legislature has expressly required every law enforcement agency in the State follow by 'adopt[ing] and implement[ing] guidelines' consistent with it." Ibid. (second and third alterations in the original) (quoting N.J.S.A. 40A:14-181).

It noted that "since the 2000 version of the IAPP, . . . every iteration of the IAPP has expressly provided that the information and records of an internal investigation could be released at the direction of the Attorney General, an authority the Legislature has never acted to limit or curtail." Id. at 146. After addressing several other arguments raised by the appellants, the court rejected the facial challenge to the Directives. Id. at 148-62.

Accordingly, we conclude, consistent with Libertarians and In re AG Directives, that the IA records sought by Gannett are personnel records under OPRA, which are exempt from disclosure under N.J.S.A. 47:1A-10. We also conclude, consistent with Fraternal Order of Police and In re AG Directives, that the IAPP has the force of law and pursuant to N.J.S.A. 47:1A-9, OPRA may not abrogate the IAPP's confidentiality provisions.

V.

The Township argues that the trial court erred by finding Gannett is entitled to Seidle's IA file under the common law right of access to public records. A decision by the trial court to order release of public records under

24

the common law is reviewed de novo.  <u>Bozzi v. Borough of Roselle Park</u>, 462

N.J. Super. 415, 424-25 (App. Div. 2020).

To prevail on a claim for access to a public record under the common law, the party seeking access must establish that:  (1) the document is a public record under the common law; (2) the party has an "interest in the subject matter" of the record; and (3) a balancing of the party's right to access and the State's interest in non-disclosure favors access.  <u>In re N.J. Firemen's Ass'n Obligation</u>, 230 N.J. 258, 281 (2017) (citing <u>Keddie v. Rutgers</u>, 148 N.J. 36, 50 (1997)).

Here, the trial court correctly determined that Gannett had satisfied the first two elements of the claim under the common law.  The court then addressed the third element.  In <u>Loigman</u>, the Court identified six nonexclusive factors to be considered in determining whether a party has established the third element of the claim:

> (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by

remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.

[102 N.J. at 113.]

The judge found that disclosure of Seidle's IA file will not discourage citizens and officers from reporting information, or "chill" agency self-evaluation, program improvement, or other decision making. In her opinion, the judge wrote:

> The murder of Tamara Seidle, the mother of nine children[,] received widespread media attention. Rumors regarding the Seidles' history of domestic violence resulted in a public outcry by citizens who questioned how such a tragedy could have occurred at the hands of a police officer. These unique facts support [Gannett's] argument that its interest in disclosure outweighs the public's interest in the confidentiality of Seidle's records.

The judge also stated that there were "important public policy considerations" that weigh in favor of maintaining the confidentiality of IA records. The judge noted that the Township had argued "disclosure would discourage citizens from reporting misconduct and obstruct the purpose of the IAPP."

26

The judge stated that others had asserted disclosure would have a chilling effect on the willingness of an officer's colleagues to report errors or misconduct. The judge also noted that others had suggested disclosure of IA files would erode public confidence in the police, and that criminal defendants could gain access to these records for use in escaping responsibility for their own actions or bringing lawsuits against the police.

The judge found that "[d]espite these compelling reasons," she could not ignore the fact that many of the incidents recorded in Seidle's IA file "have already been disclosed to the public." The judge noted that the MCPO had released information in the file, and that Seidle had voluntarily provided information to the Asbury Park Press from the file, thereby waiving any privacy claim regarding the information. The judge added that:

> [t]here is nothing about the nature of the [IA] incidents or the manner in which they were reported, that would lead [the] court to conclude that disclosure of part or all of the records would deter citizens or fellow officers from reporting police misconduct. To the extent that an [IA] investigation was prompted by a citizen complaint, there is no indication that the citizen came forward on the condition that his/her identity would not be revealed. In addition, none of the [IA] incidents were initiated by an officer who reported Seidle's alleged misconduct on the condition that his/her identity be kept secret. It is fair to say that some incidents, several of which were disclosed in the Asbury Park Press article, were initiated by supervisors

27

after performance issues were brought to their attention. To the extent that the identities of officers who either investigated incidents or provided information is included in the records, this information can be redacted to protect the integrity of, and relationships among, officers in the department.

To be sure, a blanket policy favoring disclosure would chill the ability of any particular police agency to investigate complaints, engage in "self-evaluation" and maintain the public's confidence in law enforcement. However, the likely harm that could result from disclosure of these records is minimal because much of the information included in the file is already in in the public domain. Any harm can be mitigated by redacting information that could reveal the identities of witnesses or complainants. With appropriate redactions, the public's interest in confidentiality does not outweigh the public's interest in disclosure.

On appeal, the Township argues that the trial court misapplied the Loigman balancing test. The Township asserts that public disclosure of IA files will harm IA investigations by revealing confidential "techniques and methodology." It contends disclosure will have a "chilling effect on civilian and law enforcement witnesses in future cases."

The Township further argues that affirmance of the trial court's judgment will have a "ripple effect" on law enforcement agencies throughout the State and open the "floodgates" to disclosures that will have a destructive effect on the IA process. It contends the IA files contain evaluative information that shows how

A-4006-18

law enforcement officials make policy decisions on discipline and other actions arising from the alleged misconduct of an officer, and the confidentiality of such information is at the heart of the protections afforded to IA under the IAPP.

In addition, the Township argues that the public disclosure of "kernels" of information in Seidle's IA file is not a basis for the "wholesale disclosure of the records themselves." The Township asserts the trial court was "apparently unconcerned" that the release of Seidle's IA file could interfere with the ability of the United States District Court to manage discovery in the pending civil litigation against Seidle. Finally, the Township contends the MCPO's report did not reveal significant information about Seidle's disciplinary record. It claims that under the IAPP, some of the records either belong to Seidle or are unrelated to the murder of his ex-wife.

Here, the judge correctly recognized there are important public policies that are served by maintaining the confidentiality of IA files.[2] The judge noted

---

[2] We note that the IAPP issued in 1991 provided that "[t]he progress of [IA] investigations and all supporting materials are considered confidential information" that may only be released by a "police executive or his designee . . ." The version of the IAPP issued in December 2019 states that IA records are confidential and they may only be released: (1) to the officer and hearing officer in a related disciplinary proceeding; (2) to the attorney representing the officer, agency, or governing body in a lawsuit arising from an incident covered by the IA investigation; (3) "upon the request or at the direction of the County

that in general, disclosure of IA files would have a chilling effect on the ability of a law enforcement agency to conduct IA investigations and conduct self-critical evaluations. The judge also noted that generally, disclosure of IA files would discourage citizens and fellow officers from reporting police misconduct, which would undermine the purposes of the IAPP and also undermine public confidence in the police. The judge stated that these were "compelling reasons" to bar access to IA files.

The judge found, however, that that the unique circumstances of this matter tipped the balance in favor of disclosure. As the judge noted, the records relate to a horrific crime, in which an off-duty officer shot and killed his wife, with his service revolver, in the presence of their young child. The public has a strong interest in knowing how such an event could have occurred.

Moreover, as the judge noted, Seidle's IA file includes records pertaining to twenty-eight interactions with the NTPD by Seidle or his ex-wife. In its report, the MCPO disclosed details on at least eight reported domestic violence incidents, as well as facts regarding Seidle's disputes with other officers, his fitness-for-duty evaluations, psychological treatment, and disciplinary actions.

---

Prosecutor or Attorney General"; and (4) upon a court order. The IAPP also states a "law enforcement executive may authorize access to a particular [IA] file or record for good cause."

A-4006-18

In addition, the article about Tamara's killing in the Asbury Park Press, which was written by Andrew Ford, included information from various sources, including the MCPO's report. The article revealed three complaints in which citizens alleged Seidle used excessive force, and evidence from a dismissed federal lawsuit, in which the Township's Chief of Police had testified concerning Seidle's IA investigations. Furthermore, Seidle had spoken to Ford about killing his ex-wife, and wrote him a long letter and provided him with, among other things, information from his IA file.

The judge also explained that, in this particular matter, disclosure would not discourage citizens or fellow officers from reporting police misconduct because there was no indication that any complaint was provided by a person or officer on condition of anonymity. The judge stated that any harm resulting from disclosure could be addressed by redactions of the names of witnesses, or officers who investigated the complaints.

We are convinced the trial court thoroughly considered the relevant Loigman factors and the record supports the court's conclusion that on balance, those factors weigh in favor of disclosure of Seidle's IA file. We reject the argument advanced by the Township and several amici that the MCPO's disclosure of some information from the file does not justify disclosure of the

31

entire file. The record supports the judge's finding that because many of the facts recorded in the IA file had been disclosed to the public, there was little, if any, justification to withhold disclosure of the other records.

We also reject the Township's contention that the trial court was apparently "unconcerned" that disclosure of Seidle's IA file would affect pre-trial discovery in the civil litigation against Seidle. Here, the trial court was charged with deciding whether Gannett was entitled to access to the records under the common law. The court carried out that responsibility and there is nothing in the record indicating the court's decision would have a significant adverse impact upon any related civil litigation.

In addition, we reject the Township's contention that disclosure of Seidle's entire IA file was not warranted because some of the information in that file had nothing to do with Seidle's relationship with his wife. As the judge's opinion reflects, Seidle's entire IA file, including other interactions with citizens and fellow officers, was relevant in assessing why the NTPD allowed Seidle to remain on the force with a service weapon.

As noted previously, the NJSACP contends the trial court failed to consider the State-wide ramifications of publicly releasing IA documents to a newspaper and the effect such disclosure will have on future IA investigations.

As we have explained, the judge carefully considered the effect disclosure of an IA file could have upon the agency's functions and other IA investigations.

The judge concluded, however, based on the specific facts and circumstances of this matter, that disclosure was required under the common law. Because the judge's decision was limited to the facts of this case, we do not share the NJSACP's concern that the trial court's decision will have an adverse impact upon IA investigations generally.

We have considered the remaining arguments of the Township and the amici on this issue and conclude that they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

VI.

The Township argues that the trial court erred by awarding Gannett counsel fees. The Township contends attorney's fees should not be awarded under the common law right of access to public records. As noted, the Attorney General and other amici join in this argument.

Whether the trial court correctly found that attorney's fees can be awarded in a case in which a party seeks access to public records under the common law is a question of law that we review de novo on appeal. Mejia v. Quest Diagnostics, Inc. 241 N.J. 360, 370-71 (2020). For the following reasons, we

conclude the trial court erred as a matter of law in awarding Gannett counsel fees.

In Mason v. City of Hoboken, 196 N.J. 51, 57 (2008), the Court considered whether the plaintiff was entitled to attorney's fees when a government agency voluntarily disclosed records after the plaintiff filed a lawsuit claiming a right to access to the records under OPRA and the common law. The Court adopted the "catalyst theory" and held that requestors are "entitled to attorney's fees under OPRA . . . when they can demonstrate: (1) 'a factual causal nexus between [the] litigation and the relief ultimately achieved'; and (2) 'that the relief ultimately secured by [the requestor] had a basis in law.'" Id. at 76 (quoting Singer v. State, 95 N.J. 487, 494 (1984)).

The Court then commented that "[t]he parties ha[d] not addressed at length whether the question of attorney's fees merits different treatment in an action brought under the common law[,]" and that "[a]bsent an apparent, theoretical basis for such a distinction, we conclude that the catalyst theory applies to common law suits as well." Id. at 79. The Court found that the "defendants ha[d] carried their burden of proving that [the] plaintiff's lawsuit was not the catalyst for their release of records." Id. at 80. Therefore, the "plaintiff [was] not a prevailing party entitled to attorney's fees." Ibid.

A-4006-18

A few years after <u>Mason</u> was decided, a panel of this court stated that in <u>Mason</u>, the Supreme Court "appear[ed] to accept, in the absence of briefing and argument to the contrary, that attorney's fees may be awarded in an action based on common law right to disclosure of public records." <u>K.L. v. Evesham Twp. Bd. of Educ.</u>, 423 N.J. Super. 337, 357 n.3 (App. Div. 2011). The panel did not address the issue because it concluded fees were available to the plaintiff under OPRA. <u>Id.</u> at 357 n.3, 364-65.

More recently, in <u>Stop & Shop Supermarket Co. v. County of Bergen</u>, 450 N.J. Super. 286, 290-91, 293 (App. Div. 2017), the panel found the plaintiff was not entitled to attorney's fees because the county had provided responsive documents before the plaintiff filed litigation alleging violations of OPRA and the common law. The panel quoted from <u>Mason</u>, 196 N.J. at 76, and noted the requirements for awarding fees under the catalyst theory. <u>Id.</u> at 292. The court then commented that "[u]nder the common law right of access, litigants must make the same showing." <u>Ibid.</u> (citing <u>Mason</u>, 196 N.J. at 79). The court found that the lawsuit was not the catalyst for the plaintiff's receipt of the requested records. <u>Id.</u> at 293.

In this matter, the parties and amici disagree as to whether the Court's comment in <u>Mason</u> represents dicta or a definitive holding that attorney's fees

are available to a plaintiff that successfully pursues a common law right of access. We are required, however, to follow the decisions of the Supreme Court, and in <u>Mason</u> the Court stated that in a case involving the common law right of access, attorneys' fees may be awarded under the catalyst theory unless there is "an apparent, theoretical basis" for declining to apply that theory. <u>Mason</u>, 196 N.J. at 79.

We are convinced, however, that an award of attorney's fees was not warranted in this case. Here, the Township denied Gannett's request for disclosure of Seidle's IA file. As stated previously, an officer's IA file is not a record to which the public is entitled to access under OPRA. Moreover, in denying access to the file, the Township acted in accordance with the IAPP, which provides that IA files are confidential and can only be released to the public in certain limited circumstances.

Furthermore, there is no statutory right to an award of attorney's fees to a party who successfully pursues a claim under the common law right of access to public records. The Supreme Court in <u>Mason</u> commented that attorney's fees may be awarded under the common law, but the Court has not held there is an unqualified right to such an award. Thus, the award of attorney's fees under the

common law is committed to the sound discretion of the trial court, after consideration of all relevant factors.

In this case, the Township advanced good faith arguments in support of its contention that Gannett should not be granted access to the records under the common law. The trial court found a right of access but only after a careful examination of the relevant factors under Loigman. There is no reason to assume that Gannett is not able to bear the cost and expense of pursuing this lawsuit, and the denial of fees under the particular facts and circumstances presented, would not dissuade other litigants from pursuing such claims.

Moreover, we are not convinced Gannett is entitled to an award of fees under the catalyst theory. In Mason, our Supreme Court observed that the theory is premised on the recognition that, in certain circumstances, a "plaintiff's lawsuit acted as a catalyst that prompted defendant to take an action and correct an unlawful practice." 196 N.J. at 74 (quoting Warrington v. Vill. Supermarket, Inc., 328 N.J. Super. 410, (App. Div. 2000)).

The Attorney General was not a defendant in Gannett's lawsuit, and he was not ordered to provide the IA file to Gannett. As we have explained, the trial court ordered the Township to provide Gannett with access to Seidle's IA

file; however, the court stayed its orders pending appeal and the Township never provided the records to Gannett.

Rather, while this appeal and cross appeal were pending, the Attorney General provided the records to the public pursuant to the IAPP, in the exercise of his separate and independent authority as chief law enforcement officer in this State. There is no indication that the Attorney General acted to correct what he perceived to be an unlawful practice.

Indeed, as noted previously, the Attorney General has taken no position on whether Gannett was entitled to access to Seidle's file under the common law. It appears the Attorney General ordered the release of the file because he decided that disclosure was warranted in the public interest. We therefore conclude that, under these circumstances, Gannett was not entitled to an award of attorney's fees for this action.

Affirmed in part and reversed in part on the appeal; and affirmed on the cross appeal.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4006-18